UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HACH PHETH,

                Petitioner,

     v.

MELISSA ANDREWJESKI,

                Respondent.

Case No. C22-1266-BHS-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This is a federal habeas action filed under 28 U.S.C. § 2254. Petitioner Hach Pheth ("Petitioner"), proceeding *pro se*, is currently incarcerated at the Coyote Ridge Corrections Center ("CRCC") in Connell, Washington. Petitioner seeks relief under 28 U.S.C. § 2254 from a 2017 judgment and sentence of the King County Superior Court. (Pet. (dkt. # 4).) On November 7, 2022, Respondent filed an answer and memorandum of authorities to Petitioner's habeas petition ("Respondent's Answer") (Answer (dkt. # 7)) and submitted the State Court Record (State Court Rec. (dkt. # 8)). To date, Petitioner has failed to file a response.

Having considered the parties' submissions, the governing law, and the balance of the record, the Court recommends that: (1) Petitioner's habeas petition (dkt. # 4) be DENIED; (2)

REPORT AND RECOMMENDATION - 1

this action be DISMISSED with prejudice; and (3) a certificate of appealability be DENIED as to all claims.

## II.   BACKGROUND

### A.   Statement of Facts

Petitioner is in custody under a state court judgment and sentence entered by the King County Superior Court for convictions of first-degree domestic violence rape and second-degree domestic violence assault. (*See* State Court Rec. (dkt. # 8-1), Ex. 1 at 1-2.) The Washington Court of Appeals ("Court of Appeals"), on Petitioner's direct appeal, summarized the facts underlying his convictions as follows:

> Hach Pheth and K.C. met in 2015. Pheth and K.C. were in an on-and-off romantic relationship. Pheth was "very jealous" and would often accuse K.C. of "having another man" and "a desire for a younger man." K.C. tried to end the relationship a number of times.
>
> On August 25, 2016, the State charged Pheth with domestic violence assault in the second degree of K.C. on April 15, 2016, count 1; domestic violence rape in the first degree of K.C. on April 15, 2016, count 2; and domestic violence kidnapping in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 3. The State filed an amended information charging Pheth with two additional counts of domestic violence rape in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 4 and count 5. Pheth pleaded not guilty.
>
> A number of witnesses testified at trial, including K.C., hospital social worker Emily McGuire-Wallace, sexual assault nurse Kathryn Clarke, emergency room physician Dr. Geoffrey Hubbell, King County Sheriff Deputy Brian Taylor, and Detective Patricia Maley. The court admitted a number of exhibits into evidence, including photographs showing injuries to K.C. Pheth did not testify.
>
> K.C. testified that on Friday, April 15, 2016, Pheth called and wanted her to "come to his house" after work. K.C. told Pheth she "was tired" and planned to stay home. K.C.'s son and her sister left the house to celebrate the Cambodian New Year "around 7:30" p.m. After they left, Pheth called K.C. again and said he "wanted to see" her. K.C. told Pheth her son "'will not allow you to come to this house.'" Pheth told her, "'I going [to] kill you, bitch. Watch out.'"
>
> Approximately 30 minutes later, K.C. heard Pheth knocking on the sliding glass door entrance to her bedroom. Pheth "sound[ed] angry" and asked her to "open the

door." K.C. decided to let Pheth come in "so we can talk." Pheth "s[a]t on the bed" and told K.C. he wanted to have sex. K.C. said no. Pheth pulled off her nightgown, pushed her down onto the mattress, and forcibly inserted his fingers into her vagina. K.C. told Pheth, "'I don't want to'" and pushed his hand away. Pheth said, "'Why are you saving this? Why don't you let me fuck you?'" Pheth grabbed nunchakus and hit naked K.C. on her back, her leg, her foot, the back of her head, and her forehead. Pheth "kept saying, 'Who are you saving this for? You're betraying me. Who are you saving this for?'"

Pheth stopped hitting K.C. and told her to get dressed. K.C. put on "whatever I could find at that moment," including a robe and a jacket. Pheth "pushed" K.C. outside "through the sliding door" and told her to get into her Toyota Highlander. K.C. testified that she ran next door and "knocked on the door, asking for help," but no one answered. Pheth "grabbed" K.C., "dragged" her back, and pushed her into the car. K.C. said she "did not want to go with him." When K.C. told Pheth, "'I want to call the police,'" Pheth said he would kill her. Pheth "hit [her] more . . . with a fist." K.C. "put [her] hands up over [her] face" and used her arms "to protect myself."

Pheth started driving south toward Aberdeen. When K.C. tried to use her cell phone, Pheth "grabbed the phone from my hand" and "threw the phone" out the car window. K.C. said Pheth stopped at a gas station. K.C. did not try to "get out of the car" because "I could not move I was in so much pain." K.C. was bleeding "[f]rom my back" and the top of her head.

Pheth parked the car "behind the house" where his relatives lived in Aberdeen. Pheth "folded the back seat" down and made a bed with a sleeping bag. Pheth asked K.C. to have sex with him. K.C. said, "'No, I cannot sleep with you because I'm in so much pain.'" Pheth took off K.C.'s clothes. K.C. said she tried to make Pheth stop "but he did not stop." K.C. testified that Pheth went to sleep after forcibly having sex with her. K.C. did not try to run away because "[m]y body was in pain" and "I thought I would die."

The next morning, Pheth took K.C. inside the house to use the bathroom. Pheth stood by the door while K.C. took a shower. K.C. testified that Pheth threw away some of the clothes "stained with blood." Pheth "took [K.C.] back to the car" and drove to his sister's house. K.C. was scared Pheth "would beat me up again." K.C. "didn't dare to ask" Pheth's sister for help because he "watched me as I was his prisoner." K.C. testified that Pheth "washed my coat" because there "was a lot of blood."

Pheth drove K.C. "back to the other house" where he parked the night before. Pheth accused K.C. of "wanting another man." Pheth asked K.C. to "have sex with him again." K.C. told Pheth "no" but said she "was not strong enough to stop him" because she was in such "pain." K.C. "begged" Pheth to take her home.

REPORT AND RECOMMENDATION - 3

K.C. testified that Pheth drove her back to her house Sunday evening. Before he left, Pheth asked K.C. for money. K.C. said, "I was trying just to get away from him." K.C. and Pheth drove to a nearby ATM. After K.C. gave Pheth money, he left.

K.C. did not tell any of her family members "what had happened." K.C. testified, "I wanted them to know, but not at that time. And I was so tired, I was very depressed, and I did not want to tell them at that time."

K.C. went to work the next day. K.C. "was in pain" and "felt dizzy." Her supervisor told her to leave and go to a doctor. K.C. went to the Highline Medical Center emergency room.

Highline Medical Center social worker Emily McGuire-Wallace interviewed K.C. McGuire-Wallace called the police and referred K.C. to sexual assault nurse Kathryn Clarke. Clarke performed a forensic sexual assault examination and took photographs of K.C.'s injuries. Clarke testified there was "bruising to the very back of the opening of [K.C.'s] vagina" and "evidence that the outer layer of skin was damaged."

During her testimony, Clarke used a diagram to identify the "quite extensive" injuries to K.C. The court admitted the diagram and the photographs of K.C.'s injuries into evidence. Clarke "document[ed] 20 separate injuries from lacerations and bruising" and "20 different spots on [K.C.'s] body." K.C. had two black eyes, a "laceration in between her eyes," an "injury to the left side of her head radiating from the hairline towards the left eye," an "open wound" on "the back of her head," and "a cut to her shin." K.C. had multiple and overlapping bruises and swelling in her back, "inner arm," "the right hand . . . up the wrist," "all along" the left hand that "radiated to the wrist," the "lower left arm . . . front to back," "extensive bruising" to the left and right thighs that "wrapped all the way from below her buttocks . . . to the front of her thigh," her left knee and calf, the right knee, and "her foot radiating towards the inner portion of her ankle."

Emergency room physician Dr. Geoffrey Hubbell examined K.C. K.C. told Dr. Hubbell that her "'now ex-boyfriend . . . hit her in the head with his fists and possibly'" nunchakus. K.C. told Dr. Hubbell she "'was with this man for the entire weekend, during which time, he repeatedly raped her.'" Dr. Hubbell testified that K.C. had difficulty walking and had "'pain and bruising to her head, extremities, and throughout her torso.'" Dr. Hubbell ordered X-rays and a CT3 scan.

X-rays showed K.C. "had a broken finger." The CT scan showed a subdural hematoma and "areas of bleeding inside the skull." Dr. Hubbell testified that "[t]raumatic injury" to the head could cause a subdural hematoma.

. . .

REPORT AND RECOMMENDATION - 4

1  Dr. Hubbell said that "being hit over the head" with nunchakus could cause a subdural hematoma. Dr. Hubbell admitted K.C. to the hospital for three days to
2  monitor her brain injuries because of his "concern that this might be a potentially worsening and potentially life-threatening condition." K.C. did not return to work
3  for three months.

4  King County Sheriff Deputy Brian Taylor took photographs of K.C.'s injuries at the Highline emergency room. The court admitted the photographs into evidence.
5  The photographs show "injuries to her face," "bruising around the top of her head" and "along the hairline," a cut on her nose, bruising and swelling on her left hand,
6  and "bruising all along" the left arm.

7  Detective Patricia Maley testified she did not interview K.C. on Monday, April 18, because K.C. "was in pretty bad shape." "She had bruises all over her arms. Her
8  face was bruised. She had cuts on her face. She had a cut over her nose." Detective Maley interviewed K.C. after she returned home from the hospital and took
9  photographs of the injuries. The court admitted the photographs into evidence. The photographs show bruising on K.C.'s right arm, right "shoulder area," and inner
10 left arm, an injury and bruising on her right hand, "huge swelling" and bruising on her left leg from her knee to her thigh, and bruising to the right leg and knee.
11

12 Detective Maley searched K.C.'s bedroom on Tuesday, April 19. Detective Maley found "blood on the pillowcases," "a large stain on the bedding," and "several other
   smaller stains . . . and what appears to be blood" on the sheets. Detective Maley
13 seized "clear nunchucks [sic]" near the bed. The court admitted the photographs into evidence.
14

15 During the search of K.C.'s Toyota Highlander, Detective Maley seized "a sleeping bag and a blanket" from the back of the car. Detective Maley testified there were
   "some areas of discoloration that appeared to be blood" inside the sleeping bag.
16 The court admitted photographs of K.C.'s car and items found inside the car into evidence. The photographs show "staining" that "appears to be blood" on the
17 passenger seat and headrest. A photograph of the passenger seatbelt "appears to have [a] significant amount of blood on it." Detective Maley also found what
18 appeared to be bloodstains on the passenger-side carpet and visor.

19 Detective Maley testified that Pheth admitted being in a "dating relationship" with K.C. but said he "hasn't seen her in a long time." When asked "about assaulting
20 [K.C.] and beating her," Pheth "gave a little chuckle." Pheth said, "[I]t wasn't true, he didn't do it." Pheth said K.C. "fell through the sliding glass door" because "she
21 was drunk." Pheth said he "was drunk too." Pheth said he and K.C. "stayed in the car in a driveway of a friend's house." Pheth told Detective Maley, "'If I had beat
22 and raped her, why did she give me money from the ATM.'"

23                                          . . .

REPORT AND RECOMMENDATION - 5

On August 23, the jury returned a verdict. The jury found Pheth not guilty of rape in the first degree of K.C. on April 15, 2016, count 2, and not guilty of rape in the first degree of K.C. between April 15 and April 17, 2016, count 5. The jury found Pheth guilty of assault in the second degree of K.C. on April 15, 2016, count 1; kidnapping in the first degree of K.C. between April 15, 2016 and April 17, 2016, count 3; and rape in the first degree of K.C. between April 15, 2016, and April 17, 2016, count 4. By special verdict form, the jury found Pheth and K.C. were members of the same family or household prior to or at the time the crimes of assault in the second degree, kidnapping in the first degree, and rape in the first degree were committed.

At sentencing, the court vacated the kidnapping in the first degree of K.C. conviction "for the sole reason that conviction for both Count 3 and Count 4," rape in the first degree, "would violate double jeopardy principles." The court imposed a high-end standard-range sentence.

(State Court Rec., Ex. 7 at 118-124, 128 (footnotes omitted).)

### B.  Procedural History

Petitioner appealed his convictions and sentence to the Court of Appeals. (State Court Rec., Exs. 2-4.) On April 1, 2019, the Court of Appeals issued an unpublished opinion affirming Petitioner's convictions. (State Court Rec., Ex. 7 at 118-134.)

Petitioner then sought discretionary review by the Washington Supreme Court. (State Court Rec., Ex. 8.) Petitioner presented five issues to the Washington Supreme Court, all of which related to claims that juror misconduct deprived him of his right to a fair and impartial jury. (*Id.* at 140-143.) On August 7, 2019, the Washington Supreme Court denied review without comment. (State Court. Rec., Ex. 9.) On November 14, 2019, the Court of Appeals issued the mandate terminating direct review. (State Court Rec., Ex. 10.)

On July 9, 2020, Petitioner, proceeding *pro se*, filed a personal restraint petition ("PRP") in the Court of Appeals. (State Court Rec., Ex. 11 at 181-246.) Petitioner's PRP raised the following grounds for relief:

REPORT AND RECOMMENDATION - 6

(1) Petitioner should be granted a new trial because the incompetence of the court appointed interpreter denied him his right to a fair trial and an unbiased and unprejudiced jury.

(2) Petitioner should be granted a new trial because the incompetence and hostility of the court appointed interpreters denied him his right to testify, confront witnesses, be constitutionally present at his own trial, consult with counsel, and to adequately understand the proceedings against him.

(3) Petitioner should be granted a new trial because he was denied effective assistance of counsel. Counsel['s] threat to withdraw prevented him from testifying on his own behalf due to involuntary waiver and interpreter incompetence, known to counsel, impacted the fairness of the trial because he was unable to adequately understand the proceedings against him and actively participate.

(4) Petitioner should be granted a new trial because the prosecutor committed reversible misconduct by eliciting irrelevant and inflammatory testimony that violated motions in limine and denied Petitioner his right to a fair trial.

(5) Petitioner should be granted a new trial or sentencing hearing because the incompetence and misconduct of a court appointed interpreter denied him his right to allocute accurately in his own words.

(6) The Court should enforce Petitioner's constitutional and statutory right to file post-conviction motions and order the Superior Court to file, docket/calendar, and review on the merits the twice submitted and perfected motion for post-conviction DNA testing of this, and all Petitioners.

(7) Petitioner should be granted a new trial because the cumulative impact of numerous trial/structural errors denied him a fair trial with reliable results.

(*Id.* at 182, 186, 192, 202, 207, 211, 216.)

The Court of Appeals found that Petitioner's PRP was not frivolous, referred his PRP to a Court of Appeals' panel to be heard, and appointed Petitioner post-conviction counsel. (State Court Rec., Ex. 14.) Petitioner's post-conviction counsel filed a supplemental brief that re-asserted Petitioner's *pro se* grounds for relief and added an additional ground raising whether a due process right exists to an adequate trial record for purposes of pursuing post-trial relief from a judgment and sentence. (State Court Rec., Ex. 15 at 356-357.)

REPORT AND RECOMMENDATION - 7

On December 6, 2021, the Court of Appeals ordered a reference hearing to determine whether Petitioner complied with the procedural requirements to obtain a hearing on his motion for a post-conviction DNA test, but denied the remainder of his petition. (State Court Rec., Ex. 18 at 413-30.) Petitioner subsequently sought discretionary review by the Washington Supreme Court. (State Court Rec., Ex. 19.) Petitioner raised only one ground to the Washington Supreme Court: "Under due process and equal protection principles, are non-English speaking criminal defendants entitled to an adequate record of any foreign language spoken at trial and translated into English so that it can be assessed for accuracy for purposes of posttrial relief?" (*Id.* at 436.) On August 10, 2022, the Washington Supreme Court denied review without comment. (State Court Rec., Ex. 21.)

On August 26, 2022, the Court of Appeals issued a mandate terminating review of Petitioner's PRP and remanding to the King County Superior Court for the ordered reference hearing. (State Court Rec., Ex. 22 at 399.) On September 21, 2022, Petitioner filed his federal habeas petition in this Court. (*See* Pet.)

### III.   GROUNDS FOR RELIEF

Petitioner's habeas petition identifies the following grounds for relief:

1. Mr. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process of law, to present a defense, equal protection, and competent witness interpreter due to errors/mistakes of the inattentive interpreter. (Pet. at 5.)

2. Mr. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process of law, to testify and present a defense, equal protection, and competent interpreters due to biased, hostile, conflicted interpreters. (*Id.* at 7.)

3. Mr. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process, equal protection, to testify and present and develope [sic] a defense, effective counsel when denied reference hearings. (*Id.* at 8.)

4. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process, equal protection, to testify and present a defense when defense counsel

REPORT AND RECOMMENDATION - 8

failed/refused to replace biased interpreters and threatened to withdraw. (*Id.* at 10.)

5. Mr. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process, equal protection, right to testify/allocution, present sentencing defense by hostile interpreters/denial counsel. (*Id.* at 12.)

6. Mr. Pheth was denied his U.S.C.A. 1st, 5th, 14th rights to freedom of speech, due process and equal protection due to biased hostile interpreters and denial/conflict counsel. (*Id.* at 13.)

7. Mr. Pheth was denied his U.S.C.A. rights to due process, equal protection, effective counsel, present a defense in a fair trial before an unbiased jury due to prosecutorial misconduct. (*Id.* at 15.)

8. Mr. Pheth was denied his U.S.C.A. 1st, 5th, 6th, 14th rights to free speech, due process, equal protection, effective trial/appellate counsel, right to effective/ability to appeal denied Cambodian transcript to review. (*Id.* at 17.)

9. Mr. Pheth was denied his U.S.C.A. 5th, 6th, 14th rights to due process, equal protection and effective counsel due to defense counsel's conflict-breakdown communication withdraw threat. (*Id.* at 18.)

10. Mr. Pheth was denied his U.S.C.A. 1st, 5th, 6th, 14th rights to free speech, due process, equal protection, effective counsel, competent interpreters, a fair trial unbiased jury due to cumulative error. (*Id.* at 20.)

### IV. DISCUSSION

Respondent contends that Petitioner is not entitled to relief on any of the habeas claims raised in his petition because of his failure to exhaust his state court remedies. (*See* Answer at 8-11.) Petitioner did not file a response.

In this case, Petitioner failed to properly exhaust his state court remedies with regard to all ten grounds for relief raised in his petition before seeking federal habeas relief. However, even with regard to Petitioner's sole ground for relief that might arguably be deemed exhausted, *i.e.*, Petitioner's eighth ground in which he asserts he was entitled to an audio recording of the Cambodian language spoken at his trial, Petitioner fails to demonstrate the Court of Appeals

REPORT AND RECOMMENDATION - 9

adjudication of his claim was contrary to, or an unreasonable application of, United States Supreme Court precedent.

### A. Exhaustion and Procedural Default

To obtain relief under § 2254, a petitioner must demonstrate that each of his claims for federal habeas relief has been properly exhausted in the state courts. 28 U.S.C. § 2254(b)-(c). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted). To provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). In *Picard*, the Supreme Court noted in relevant part:

> [I]t is not sufficient merely that the federal habeas applicant has been through the state courts. The [exhaustion] rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. *Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.*

*Picard*, 404 U.S. at 275-76 (emphasis added).

Here, Petitioner failed to exhaust his grounds for relief by not fairly presenting them to the Washington Supreme Court. Although Petitioner raised several of his asserted grounds in his federal habeas petition to the Court of Appeals in his PRP, Petitioner did not seek review of those grounds by the Washington Supreme Court. The only issue touched on by the grounds raised in Petitioner's federal habeas petition that was possibly raised to the Washington Supreme

REPORT AND RECOMMENDATION - 10

Court is his claim that he was entitled to an audio recording of the Cambodian language spoken at his trial, which was asserted in Petitioner's motion for discretionary review of his PRP. (*See* State Court Rec., Ex. 19 at 436.) Given that this was the only issue presented to the Washington Supreme Court on discretionary review of his PRP, Petitioner clearly failed to properly exhaust grounds for relief 1-7, and grounds for relief 9-10, of his federal habeas petition in the state courts. *See Baldwin*, 541 U.S. at 29.

Moreover, Petitioner failed to present his eighth ground for habeas relief to the Washington Supreme Court as a federal claim. To present the legal basis of a habeas claim fairly and fully, a petitioner must alert the state courts to the fact that he is asserting a federal claim. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). To that end, the petitioner "must make the federal basis of the claim explicit either by specifying particular provisions of the federal Constitution or statutes, or by citing to federal case law." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005). "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).

Here, Petitioner's motion for discretionary review to the Washington Supreme Court on the issue of his right to a Cambodian transcript for review failed to cite to any specific federal constitutional provisions or federal case law. (*See* State Court Rec., Ex. 19.) Instead, Petitioner made references to "due process and equal protection principles" in raising his claim to the Washington Supreme Court, but did not cite to any federal constitutional provisions and otherwise exclusively relied on citation to state authorities. (*See id.* at 434-436.) As Petitioner failed to satisfy either requirement in raising this issue to the Washington Supreme Court, Petitioner's eighth ground for relief has also not been properly exhausted.

REPORT AND RECOMMENDATION - 11

When a petitioner fails to exhaust his state court remedies, and the court to which petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for purposes of federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). In such instances, federal habeas review of the claims is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate failure to consider the claims will result in a fundamental miscarriage of justice." *Id*. at 750.

On this aspect, Petitioner would now be time barred under Washington law from returning to the state courts to present his unexhausted claims, and any attempt to do so would otherwise be barred as successive. *See* RCW 10.73.090(1) (requiring that collateral attack on a judgment and sentence be filed in state court within one year of date the judgment becomes final), 10.73.140 (prohibiting filing of second collateral challenge to a criminal judgment). The Court therefore concludes that Petitioner has procedurally defaulted his grounds for relief. Petitioner additionally makes no effort to show cause or prejudice for his default, nor does he make any showing that failure to consider his defaulted claims will result in a fundamental miscarriage of justice.

As Petitioner's grounds for relief were not properly exhausted in the Washington state courts, the Court concludes that Petitioner's habeas petition is not eligible for federal habeas review. Nevertheless, even if Petitioner had exhausted his eighth ground for relief before the Washington Supreme Court, and for purposes of creating a record on this Report and Recommendation, the Court will proceed to examine that ground for relief on its merits.

      **B.**      **Section 2254 Merits Review**

           *1.*      *Legal Standard*

Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). The Supreme Court has also explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S.

REPORT AND RECOMMENDATION - 13

at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

    2.  *Ground Eight: Trial Audio Recording*

Petitioner argues under his eighth ground for relief in his habeas petition that he was constitutionally entitled under the First, Fifth, Sixth, and Fourteenth Amendments to an audio recording of the Cambodian language spoken at trial to compare against the English language transcript. (Pet. at 17.) The Court of Appeals, in analyzing Petitioner's claim on review of his PRP that he was entitled to an audio recording preserving the Cambodian language spoken during his trial, found:

> The precise issue being raised here is whether equal protection, due process, effective assistance of counsel, and the right to appeal required the court to make an audible audio recording during trial of all statements made to and from the interpreters in English and Cambodian, so that any erroneous interpretation could be documented . . . .
>
> . . .
>
> In support of his argument, Pheth provides citations to cases addressing the inadequacy of reconstructed records. But this is not a question of a reconstructed record. Rather, the issue Pheth raises depends on information that was not part of the record on his direct appeal. Pheth has the burden of establishing a record to support his claims of error and prejudice. He contends that without the audible

at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

In considering a habeas petition, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

    2.  *Ground Eight: Trial Audio Recording*

Petitioner argues under his eighth ground for relief in his habeas petition that he was constitutionally entitled under the First, Fifth, Sixth, and Fourteenth Amendments to an audio recording of the Cambodian language spoken at trial to compare against the English language transcript. (Pet. at 17.) The Court of Appeals, in analyzing Petitioner's claim on review of his PRP that he was entitled to an audio recording preserving the Cambodian language spoken during his trial, found:

> The precise issue being raised here is whether equal protection, due process, effective assistance of counsel, and the right to appeal required the court to make an audible audio recording during trial of all statements made to and from the interpreters in English and Cambodian, so that any erroneous interpretation could be documented . . . .
>
> . . .
>
> In support of his argument, Pheth provides citations to cases addressing the inadequacy of reconstructed records. But this is not a question of a reconstructed record. Rather, the issue Pheth raises depends on information that was not part of the record on his direct appeal. Pheth has the burden of establishing a record to support his claims of error and prejudice. He contends that without the audible

audio recording of every statement to and from his interpreters in English and Cambodian, he is precluded from meeting his burden.

Here, the law and the facts are especially unfavorable to his theory. The English interpretation is the trial court record. No statutes or case law support his view that an audible audio recording of court proceedings including all statements made to and from interpreters in English and Cambodian is routinely required.

At trial, the court appointed two interpreters, [Sarith] Tim and [Vizochanea] Morton, to assist Pheth in understanding the proceedings.

First the court engaged in a colloquy with Tim, a state certified Cambodian interpreter, and Pheth to ensure that Pheth could understand and communicate with him. The court also engaged in a colloquy with Morton, another state certified Cambodian interpreter, and Pheth to ensure that Pheth could understand and communicate with him. Pheth confirmed to the court that he could understand and communicate with both Tim and Morton. During these colloquies, the court also told Pheth "that if there's any point in the proceedings where you are concerned that you are not understanding an interpreter that you let your lawyer know so that she can notify the court." Pheth responded, "Yes, Your Honor." Pheth never expressed to the court an inability to understand or communicate with Tim or Morton.

In making his arguments, Pheth cites to various articles advocating for a complete audible audio recording of court proceedings including all statements made to and from interpreters, but no courts have routinely required such a recording. His remaining arguments are not persuasive.

First, Pheth contends that Tim and Morton were "hostile" toward him given the nature of his charges and "habitually spoke simultaneously, often interrupting each other and rendering large portions of testimony totally indecipherable." But the substance of the interpreters' statements is not necessarily needed for the court to visually discern if Tim and Morton were speaking at the same time. And the only citation to the record Pheth provides in support of this claim is his own self-serving affidavit. Pheth's "bare allegations" are insufficient to establish that he was "actually" and "substantially" prejudiced by his recollection of the interpretation at trial.

Second, Pheth argues that at sentencing his allocution to the court was misinterpreted. The record provides that Pheth stated: "I have a couple words to say. I have an elderly dad at home. I have three children. I understand what I have done. I hope that the judge will give me some leniency. I want to change my life, start all over. Thank you." But in his own self-serving affidavit, Pheth claims he actually said:

REPORT AND RECOMMENDATION - 15

> I have a couple words to say. I have an elderly dad at home. I have three children and don't know when I'm going to see them again. My entire life I have picked the wrong women. I did not do this and I regret dating her. I hope the judge will give me some leniency. I want to change my life. Start all over without her in my life.

In support of Pheth's assertion, his counsel on this personal restraint petition submitted a declaration stating that in general the audio recordings from the court proceedings were inadequate to document precisely what the interpreters were saying in Cambodian "because of the low volume at which it was spoken." But Pheth's allocution in open court in Cambodian was translated into English. And Pheth and his counsel fail to establish that the available audible audio recording of Pheth's allocution in Cambodian could not have been reviewed by a third[-]party interpreter to determine if any misinterpretation occurred.

Finally, in a related argument, Pheth contends that K.C.'s interpreter [Keo] Chetra "lacked focus and was admonished by the court for failing to participate in the proceedings[,] gave wildly inaccurate and misleading answers in English, repeatedly failed to understand the questions posed to him in English, and repeatedly gave nonsensical and nonresponsive answers." In support of this contention, Pheth argues that the "most inherently prejudicial" interpretation error occurred during Chetra's interpretation of K.C.'s testimony.

Specifically, on direct examination of K.C., the prosecutor asked K.C. if Pheth hit her with any other object besides "nunchucks." K.C. responded that she did not remember because she was "confused." But Chetra interpreted the word "confused" as "unconscious." Chetra admitted the error to the prosecutor, Pheth's counsel, and the court. Chetra stated, "I approached the prosecutor because I used the word "unconscious" when [K.C.] used the [word] (says Cambodian word), and I couldn't find an equivalency for the [word] (says Cambodian word) at that moment, so my interpretation was "unconscious," and it [should have been] "confused" instead of "unconscious," Your Honor." As a result, the court informed the jury of the question the prosecutor asked K.C., K.C.'s response as it was originally interpreted by Chetra that K.C. was "unconscious," and Chetra's correction that K.C.'s actual testimony was that she was "confused." This single incident seems to illustrate the care of Chetra to make a correction rather than reveal incompetence or hostility toward Pheth.

The existing standards do not require an audible audio recording of all statements made to and from interpreters and the facts here do not establish prejudicial incompetence or misconduct by the interpreters as Pheth alleges.

(State Court Rec., Ex. 18 at 417-423 (citations and footnotes omitted).)

REPORT AND RECOMMENDATION - 16

On this claim, Petitioner fails to demonstrate the Court of Appeals' determination was contrary to or an unreasonable application of United States Supreme Court precedent. Petitioner fails to cite to any Supreme Court precedent, or any other federal authorities, suggesting he is entitled to an audio recording of the Cambodian language spoken and translated into English during his trial. (*See* Pet. at 17.) In fact, "[t]he United States Supreme Court has yet to recognize the right to a court-appointed interpreter as a constitutional one." *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001); *see also Hernandez v. Frauenheim*, 2020 WL 7232129, at *7 (C.D. Cal. Oct. 15, 2020) (citing *Nguyen v. Booker*, 496 F. App'x 502, 506 (6th Cir. 2012) (finding that the Supreme Court has "not spoken" to the issue of whether a criminal defendant has "a constitutional right to an interpreter in state court proceedings.")). Given that the Supreme Court has yet to recognize a constitutional right to a court-appointed interpreter, it follows that the Supreme Court has similarly yet to recognize any constitutional right to check a court-appointed interpreter's work against an audio recording of the foreign languages originally spoken at trial.

Because Petitioner fails to demonstrate that there exists any clearly established Supreme Court precedent concerning issues surrounding not receiving a transcript in the Cambodian language, the state court's adjudication of his claim on this ground cannot be deemed contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Brewer*, 378 F.3d at 955. Therefore, the Court additionally recommends that Petitioner's eighth ground for relief, if considered on the merits, be denied.

## V. CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a

district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, the Court recommends that a certificate of appealability be denied as to all claims.

## VI.    CONCLUSION

For the foregoing reasons, this Court recommends that Petitioner's habeas petition (dkt. # 4) be DENIED, and that this action be DISMISSED with prejudice. The Court further recommends that a certificate of appealability be DENIED as to all claims. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **twenty-one (21)** days after the filing of this Report and Recommendation. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motion calendar **fourteen (14)** days after they are served and filed. Responses to objections, if any, shall be filed no later than **fourteen (14)** days after service and filing of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 27, 2023.**

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable Benjamin H. Settle.

\\

Dated this 6th day of January, 2023.

*[signature]*

MICHELLE L. PETERSON
United States Magistrate Judge